AO 91
Rev. 11/82

ORIGINAL

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. CONSTANTINE PETER KALLAS, and MARIA GABRIELA KALLAS | DOCKET NO.  MAGISTRATE'S CASE NO. SA08-319 M  08- |
|---|---|

Complaint for violation of Title 18, United States Code § 201(b)(2), 2

| NAME OF MAGISTRATE JUDGE MARC L. GOLDMAN | UNITED STATES MAGISTRATE JUDGE | LOCATION Santa Ana, CA |
|---|---|---|

| DATE OF OFFENSE June 26, 2008 | PLACE OF OFFENSE San Bernardino County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about June 26, 2008, in San Bernardino County, California, within the Central District of California, and elsewhere, defendant CONSTANTINE PETER KALLAS, a public official, aided and abetted by defendant MARIA GABRIELA KALLAS, directly and indirectly did corruptly demand, seek, receive, and accept something of value personally in return for being influenced in the performance of an official act, that is defendants CONSTANTINE PETER KALLAS and MARIA GABRIELA KALLAS demanded and received $20,000.00 in United States currency in return for defendant CONSTANTINE PETER KALLAS, an Assistant Chief Counsel at Immigration and Customs Enforcement, performing official acts to help an illegal alien obtain legal status in the United States.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
  (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

FILED
JUN 27 2008
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _____ DEPUTY

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge.  Lawrence Owen | SIGNATURE OF COMPLAINANT LAWRENCE OWEN |
|---|---|
| | OFFICIAL TITLE Special Agent - HOMELAND SECURITY /ICE-OPR |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE (1)  MARC L. GOLDMAN | DATE June 27, 2008 |
|---|---|

ROA: mc  ROA

**AFFIDAVIT**

I, Lawrence Owen, having been duly sworn, state the following:

## I.   INTRODUCTION

1.   I am currently employed as a Senior Special Agent (SSA) with the Department of Homeland Security (DHS) Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR).  Prior to the formation of ICE, I was employed by its predecessor agency, the United States Customs Service, as a Special Agent, and was so employed since November 17, 1998.  I have experience and received training with respect to conducting investigations of civil and criminal violations of Titles 8, 18, 19, 21, 31 of the United States Code, and various other federal statutes.  My training and experience include the areas of finance and investigations of financial fraud, money laundering, smuggling, immigration, and narcotics interdiction.  I am currently assigned to the Los Angeles office of OPR.

2.   Unless otherwise stated, I have personal knowledge of the matters set out in this affidavit.  To the extent that any information in this affidavit is not within my personal knowledge, it was made known to me through my own review of the documents discussed herein, interviews of witnesses, surveillance, undercover operations, and reliable law enforcement sources, including discussions with other law enforcement agents,

1

and I believe it to be true.

## II.   PURPOSE OF AFFIDAVIT

3.    This statement is made in support of a criminal complaint charging CONSTANTINE PETER KALLAS ("C. Kallas"), a DHS, ICE Assistant Chief Counsel and MARIA GABRIELA KALLAS ("M. Kallas"), wife of C. Kallas, (C. Kallas and M. Kallas are collectively referred to as "the Kallases"), committed criminal offenses in violation of Title 18 United States Code Section 201(b)(2) (bribery), and 2 (aiding and abetting).

4.    This affidavit is intended to show that there is probable cause for the requested complaint and does not purport to set forth all of my knowledge, or investigation into, this matter.  The following is based on my own personal knowledge and investigation, as well as information I received from reliable sources, including other law enforcement officers and witnesses, as well as my review of the documents and records concerning the this investigation.

5.    The term "Undocumented Alien" as used in this affidavit refers to an individual, who is an alien unlawfully in the United States.  The letters "INS" used throughout this affidavit, refers to the former Immigration Naturalization Service, abolished in 2003 with the creation of DHS.

6.    The term "A-File" refers to an Alien Registration File, as maintained by DHS, which contains immigration records for

2

aliens admitted to or found within the United States.   These
records include, but are not limited to, photographs,
fingerprints, court records, and immigration or employment
petitions filed by or on behalf of an alien.

### III.   OVERVIEW OF EMPLOYMENT RELATED IMMIGRATION

#### A.   United States Citizenship and Immigration Services

7.   United States Citizenship and Immigration Services
("USCIS") is the department within DHS charged with
administrating the legal process by which foreign aliens use to
immigrate to the United States.   USCIS is responsible for the
administration of immigration and naturalization adjudication
functions and establishing immigration services, policies and
priorities.

8.   Immigration benefits overseen by USCIS include:
citizenship, lawful permanent residency, family and employment-
related immigration, employment authorization, inter-country
adoptions, asylum and refugee status, replacement immigration
documents, and foreign student authorization.

#### B.   Permanent Labor Certification Process

9.   A permanent labor certification issued by the
Department of Labor ("DOL") allows an employer to hire an alien
to work permanently in the United States.   In most instances,
before an United States employer can submit an immigration
petition to USCIS, the employer must obtain an approved foreign

3

labor certification request from the DOL's Employment and
Training Administration ("ETA").  This request, called an ETA
Form 9089 ("ETA 9089"), certifies to the USCIS that there are no
United States workers able, willing, qualified and available to
accept the job at the prevailing wage for that occupation in the
area of intended employment and that employment of the alien will
not adversely affect the wages and working conditions of those
similarly employed in the United States.

10.  Prior to March 2005, ETA 9089s were submitted by mail.
ETA 9089s submitted by mail required the original signatures of
the employer, alien, and preparer, if applicable, when received
by the USCIS processing center.  In March 2005, DOL's ETA
certification process went "online" allowing employers to
establish an account with the ETA and submit applications
electronically.  Applications filed electronically must, upon
receipt of the labor certification approved by ETA, be signed
immediately by the employer, alien, and preparer, if applicable,
in order to be valid.

11.  Upon approval of the labor certification, the employer
must file an Immigrant Petition for an Alien Worker ("I-140
Petition"), with USCIS.  The employer then attaches the certified
ETA 9089 to a completed USCIS Form I-140 Petition, along with the
appropriate application fees and other USCIS specified
documentation and submits the package to the appropriate USCIS

4

Service Center.

12.   Once the DOL approved ETA 9089 and the I-140 Petition are sent to an USCIS service center and approved, the alien can apply to USCIS for permanent resident alien status by filing an Adjustment of Status Petition, Form I-485 ("I-485 Petition").  If the alien is already in the United States at the time of the filing, the I-140 and the I-485 petitions will be filed together. A temporary one-year work authorization is provided to the alien during the petition process.

13.   If the alien is outside the United States, only the ETA 9089 and the I-140 Petition are filed.  If approved, USCIS works with the State Department and a valid visa is issued to the alien in the foreign country.  While an I-140 Petition may be approved if an alien is in the United States illegally at the time the application is submitted, an I-485 Petition, however, will likely be denied.

14.   Immigration benefits are processed at USCIS Service Centers throughout the United States.  Employment based I-140 and I-485 Petitions are processed at the Texas and Nebraska Service Centers.  The processing fee for such petitions is normally several hundred dollars.  If the alien does not have an alien registration number, one is assigned, and an Alien Registration file (A-File) is created.

15.   The A-file is then forwarded to a USCIS adjudicator for

5

review.   If there are no admissibility questions or the alien

does not have a prior criminal history, the I-140 and the I-485

will be approved.   If there are questions, the alien's file will

be sent to a USCIS district office where the alien resides for

further review.

C.   **USCIS Adjudications**

16.   Within USCIS, Adjudications Officers are charged with

interpreting, applying and enforcing immigration and nationality

laws.   This includes processing applications and petitions using

the law, policy memoranda and precedent decisions.   Adjudications

Officers must also conduct independent research concerning the

eligibility entitlements of persons seeking immigration benefits,

employment and/or legal status under the Immigration and

Nationality Act.

17.   Applicants for immigration benefits may be interviewed

by an Adjudications Officer to determine their eligibility for

the benefit sought.   Adjudications Officers grant and deny

benefits based on their review of the evidence submitted with

each application or petition.   For each adverse decision, the

Adjudications Officer writes a decision citing the basis in the

law for the denial.   A copy of the Adjudications Officer's

decision is submitted in the A-File.

**IV. ICE OFFICE OF CHIEF COUNSEL**

18.   The Office of Chief Counsel (OCC), where C. Kallas has

6

been employed since June 7, 1998, is a department of the Office
of Principle Legal Advisor, within ICE.  The OCC is comprised of
Attorneys who argue on behalf of the government in Civil
Administrative Deportation Removal hearings and provide Legal
advice for other components of ICE.  C. Kallas is employed as an
Assistant Chief Counsel in the OCC.

## V.   SUMMARY OF PROBABLE CAUSE

19.   As described in more detail below, I believe probable
cause exists that undocumented aliens paid thousands of dollars
to the Kallases for the purpose of gaining an immigration benefit
based on C. Kallas' title and position as a DHS ICE attorney.
Once the undocumented aliens paid the money either directly to
the Kallases, or indirectly through a middleman recruiter acting
on behalf of the Kallases, the Kallases and A. Fisco in turn used
two shell companies, known as Botno Inc., and Mississippi Valley
Consulting Inc., (MVCI), to file false DOL ETA 9089 forms and
immigration petitions, specifically citizenship based benefits on
behalf of legal permanent residents and employment and residency
based benefits for undocumented aliens residing unlawfully in the
United States.  To date, ICE OPR has identified approximately 45
undocumented aliens and 2 legal permanent residents who are
believed to have each paid the Kallases thousands of dollars to
obtain a purported immigration benefit.

20.   The Kallases utilized a recruiter named CS, now a

7

cooperating law enforcement source, who sought out undocumented aliens and legal permanent residents as clients for the Kallases. Based on CS's discussions with C. Kallas, CS told prospective clients that he knew of a high level immigration official within INS who could help them obtain work authorization permits and permanent residency status for a fee even if they were unlawfully residing in the United States. Upon collecting the required fee and documents as directed by the Kallases, CS would then meet with the Kallases and deliver the fees and documents to them.

21. Utilizing the shell companies Botno Inc., and MVCI, the Kallases and A. Fisco submitted false information to USCIS and DOL claiming that the undocumented aliens were being hired to occupy skilled labor positions, such as human resource managers, engineers, and analysts. Interviews of the undocumented aliens disclosed that they had no training to work as skilled laborers as stated in the USCIS and DOL documents, and knew nothing about the sponsoring shell companies and had no intention of working at those companies.

22. During a recorded conversation with another cooperating witness, MS, C. Kallas discussed the payment he received from MS for prior immigration work conducted by C. Kallas and told MS that he, C. Kallas, still had MS's file.

23. Upon receiving the unlawful proceeds from the undocumented aliens, the Kallases laundered these proceeds

through any of a number of Washington Mutual Bank accounts and
one Bank of America bank account, some of which were held in the
names of relatives, but in fact controlled and used by the
Kallases and A. Fisco.  Review of records for these bank accounts
revealed that from 2000 to the present, excluding C. Kallases
government salary, the Kallases and A. Fisco deposited
approximately $950,000.00 from their immigration scheme.  Bank
records also revealed that many of the deposits were made as
whole figure cash transactions under $10,000.00 (i.e., $5,000,
$2,000, $9,000 etc).

24.  On June 26, 2008, the Kallases accepted a $20,000.00
payment from MS, an undocumented alien, while meeting with MS at
a casino in Highland, California.

## VI.  INVESTIGATION

### A.  Patty Gamba

25.  In March 2007, OPR ("SSA") Ericka Kelly informed me
that on March 6, 2007, she and OPR SSA Lee Dolan, interviewed
Patty Gamba ("Ms. Gamba"), the owner of Dermix Medical Spa and
learned the following information from Ms. Gamba.

a.   Approximately 4 years prior to the above mentioned
interview date, Ms. Gamba and her husband met a couple named
"Dean" and "Nene" Kallas on a cruise from the United States to
St. Thomas.

b.   Ms. Gamba showed SSAs Kelly and Dolan a business

card "Dean" had provided her during the cruise.  The name printed
on the card was "Constantine P. Kallas," with the title of
"Assistant District Counsel" for the "US Department of Justice,
Immigration and Naturalization Service, Office of the District
Counsel," located at "606 Olive St., 6th Floor, Los Angeles,
California, 90014," with the telephone number "(213) 894-2805 x
162."

        c.    Ms. Gamba and her husband remained in contact with
"Dean" and "Nene" after they returned from the cruise.
Approximately six months after meeting Dean and Nene, Ms. Gamba
introduced CS and his wife to Dean and Nene during a barbeque
gathering at Ms. Gamba's home.

        **B.    CS**

    26.   On April 12, 2007, February 6, 2008 and April 21, 2008
ICE SSAs interviewed CS.  Based on these interviews, I learned
the following information from the interviews:

        a.    CS and his wife, first met C. Kallas three or four
years prior to the first interview of April 12, 2007 at a
barbeque gathering at Ms. Gamba's residence.  During the
gathering, C. Kallas told CS that his position was second only to
an immigration judge.

        b.    C. Kallas also asked CS about his immigration
status.  CS told C. Kallas that he was in the process of
receiving a work authorization card, however, his company sponsor

                                    10

was out of business.  In response C. Kallas told CS that he could help CS obtain his work authorization card if CS was willing to pay C. Kallas $16,000.00 in cash.  C. Kallas told CS there were millions of people in line ahead of him waiting for an interview with immigration, but he would be able to place CS at the front of the line.

      c.   Approximately one month after meeting C. Kallas, CS paid $16,000.00 cash to C. Kallas. CS received a work authorization card shortly thereafter.  Other than providing C. Kallas the last letter that CS received from USCIS, stating that CS's sponsor was required to appear at an interview with him, CS did not apply for or take any action to receive his work authorization card.

      d.   Shortly after paying C. Kallas $16,000.00 in cash for his immigration matter, CS asked C. Kallas if he could also obtain a "green card" for CS's brother living in Argentina.  C. Kallas told CS that he could help his brother for $20,000.00. When CS told C. Kallas that he could not afford to pay that amount, C. Kallas replied that he would reduce the rate if CS referred clients to C. Kallas.  C. Kallas specifically asked if CS had any friends who were "without papers."  C. Kallas told CS that if the individuals had "papers" they would not need C. Kallas' services.

      e.   As a recruiter for C. Kallas, CS served as the

direct contact between the Kallases and the undocumented aliens. The Kallases would not directly meet or speak with the undocumented aliens.  C. Kallas also advised CS that he would only accept cash payments.

   f.   C. Kallas instructed CS as to what type of documents he should retrieve from the potential alien clients. M. Kallas told CS the fees he should quote the undocumented aliens.  M. Kallas specifically told CS that the typical fee charged by C. Kallas was $16,000.00 if the undocumented alien had his or her own company sponsor; $20,000.00 if they did not.  CS recalled that C. Kallas used the company name "Botno Inc.," to sponsor undocumented aliens that did not have a sponsor of their own.

   g.   Thereafter, CS began recruiting a number of undocumented aliens residing in the United States who were willing to pay C. Kallas to "fast track" their work authorization, citizenship, or other immigration matters.  Each of the individuals recruited by CS paid their fees to the Kallases through CS.  The money each individual paid to the Kallases ranged from $10,000 to $20,000 cash, depending on the immigration status and issues of each individual alien.  C. Kallas specified, however, that if an individual alien provided a money order, the "Pay to the order of" line on the money orders was to remain blank.

12

h.   Upon recruiting a "client," CS would meet with the Kallases at their home office located downstairs below the entry level of the residence located at 10427 Pebble Court, Alta Loma, California 91737 (the "Kallas residence"). CS specifically described the location of the Kallas residence and provided directions on how to get to the Kallas residence. The description of the residence and the route taken to reach the Kallas residence was the same route I have taken when conducting surveillance on the Kallas residence.

i.   During visits to the Kallas residence, C. Kallas would inform CS to obtain specific documents from each individual client. Depending on the immigration status of each individual alien, the documents requested ranged from copies of passports, driver's licenses, or social security cards. C. Kallas would tell CS to place all the documents in a sealed packet before bringing them to the Kallas residence. While meeting at the Kallas residence, CS would provide the documents from the undocumented aliens to C. Kallas and the cash and money orders to M. Kallas.

j.   CS recalled that on two separate occasions, while dropping off money and documents at the Kallas residence, he observed a Hispanic male entering and leaving the residence. On one occasion, as the Hispanic male was leaving the residence, CS overheard M. Kallas tell C. Kallas words to the effect that

13

"those are for other customers."

k.   CS recalled that on one occasion, he asked C. Kallas why the fees for his immigration services were so high. In response, C. Kallas told CS that he had to charge a lot of money because he also had to pay the "people" inside the immigration court that were working for him.

l.   CS began receiving complaints from individuals who had paid the Kallases, through CS, for immigration benefits.  The alien complainants told CS that they had not received an immigration benefit as promised.  CS made a number of efforts to contact C. Kallas to no avail.  CS last contacted C. Kallas by email, at "laimmigration@hotmail.com" in December 2006.

27.  I showed CS a list of names of approximately 33 undocumented aliens and two resident aliens who were sponsored by Botno Inc., as the sponsoring company in the ETA 9089s I received from DOL.  From this list, CS identified five individuals, (1) Esmeralda Garcia, (2) Hilda Marroquin, (3) Christian Chamaro, (4) Daniel Garcia, and (5) Manuel Rosas, from whom he collected money and documents and provided to the Kallases.

C.   **Esmeralda Garcia**

28.  On January 31, 2007, the OCC in Los Angeles, where C. Kallas is employed, received a telephone call from an individual identifying herself as Esmeralda Garcia, ("Ms. Garcia"), who was requesting to speak to C. Kallas.  Ms. Garcia was told that C.

14

Kallas was unavailable as he was not currently reporting to work
due to an injury sustained on January 17, 2007. During the
telephone call, Ms. Garcia told Jose Aldama, the file clerk with
whom Ms. Garcia was speaking with, that she was calling to report
immigration fraud. Ms. Garcia stated that C. Kallas was charging
undocumented aliens a fee to help adjust their immigration
status. Ms. Garcia elaborated that there were other individuals
acting as middlemen who were assisting C. Kallas in the
immigration scheme. Ms Garcia stated that she and other
undocumented aliens paid large sums of money to C. Kallas, but
had not received any results. Prior to concluding the telephone
call, Ms. Garcia provided her name and telephone number to Mr.
Aldama.

     29.   ICE SSA Erika Kelly told me that in February 2007, she
and OPR SSA Tracie Uchida interviewed Ms. Garcia. SSA Kelly told
me that they learned the following information from their
interview of Ms. Garcia:

     a.   In or about the winter months of 2005, Ms.
Garcia's friend, Ms. Hilda Marroquin, (Ms. Marroquin), advised
Ms. Garcia that CS's wife, knew an immigration official that
could help her with her immigration issues. Ms. Garcia, who was
a legal permanent resident at the time, was interested in
speeding up her United States citizenship process and thus
contacted CS and arranged to meet with CS and his wife. During

                              15

their meeting, CS told Ms. Garcia, that he knew a high level
immigration official named "Tim," and his wife "Nene," who could
speed up her United States citizenship process if she was willing
to pay $20,000.00.

   b.   After borrowing money from relatives, Ms. Garcia
gave CS $16,000.00 in cash in September 2005, and paid an
additional $4,000.00 six months thereafter.

   c.   Approximately three months after paying the
$20,000.00, Ms. Garcia asked CS about the status of her case.  CS
told Ms. Garcia that "Tim" was trying to help Ms. Garcia, but Ms.
Garcia could not tell anyone else about the matter.  CS refused
to provide Ms. Garcia with C. Kallas' contact information.

   d.   In approximately April of 2007, Ms. Garcia, along
with Ms. Marroquin, contacted CS and told him that they wanted
their money back.  CS told Ms. Garcia that he had contacted "Tim"
and that "Tim" had advised CS that he would return their money in
one week.

   e.   Several months after speaking with CS about
getting their money back, Ms. Garcia and Ms. Marroquin told Ms.
Gamba, a mutual friend of Ms. Garcia, Ms. Marroquin, and CS, that
they had paid C. Kallas and had not received anything in return.
Ms. Gamba told Ms. Garcia and Ms. Marroquin that she had C.
Kallas' INS business card.  Ms. Gamba provided the telephone
number on the card to Ms. Garcia and Ms. Marroquin.

16

f.   Ms. Garcia and Ms. Marroquin then contacted C. Kallas at his office.  After Ms. Garcia identified herself, C. Kallas told Ms. Garcia that he would not meet with the public and would not see her.  Ms. Garcia then told C. Kallas that Ms. Marroquin wanted to speak with him.  C. Kallas told Ms. Marroquin not to call this number again.  Ms. Garcia and Ms. Marroquin then called "Nene's" cellular telephone number, (626) 676-1068, but it had been disconnected.

g.   The next day, Ms. Garcia and Ms. Marroquin again called C. Kallas' office number, but were told by someone at the office that C. Kallas was on vacation.  Ms. Marroquin then asked for a Spanish speaker as she wanted to report C. Kallas' activities.

**D.   <u>Hilda Marroquin</u>**

30.   In March 2007, OPR SSA Ericka Kelly told me that in February 2007, she and OPR SSA Tracie Uchida interviewed Ms. Marroquin and learned the following information:

a.   In or about winter of 2005, Ms. Marroquin was telling her cosmetologist, CS's wife, about her immigration situation.  CS's wife told Ms. Marroquin that, the owner of the spa, Patti Gamba knew a high level immigration official named "Tim" who could help her with her immigration issues.

b.   A few days later, CS contacted Ms. Marroquin and told her that she could receive a "green card" in approximately

17

six weeks for a price of $13,000.00.  CS also told Ms. Marroquin that "Tim" was a high level immigration official.

c.    Ms. Marroquin borrowed $13,000.00 from relatives and paid CS in cash.  After waiting three months, Ms. Marroquin called CS and asked for her money back.  During telephone conversations with CS, CS told Ms. Marroquin that he could not give Ms. Marroquin her money back as it had already been divided amongst others.  During one of their telephone conversations, CS referred to M. Kallas as "Nene" and provided Ms. Marroquin with Nene's cellular telephone number, (626) 676-1068.

d.    Thereafter, Ms. Gamba provided Ms. Marroquin and Ms. Garcia with "Tim's" cellular telephone number, (626) 840-0720.

e.    Ms. Marroquin contacted the telephone number, (626) 846-0720 as provided by Ms. Gamba on or about January 2007. When Ms. Marroquin contacted that telephone number, a man answered the telephone.  After Ms. Marroquin identified herself to the individual on the phone, that individual told Ms. Marroquin that he would call her back the next day.  Ms. Marroquin did not receive a return call.  When Ms. Marroquin called the same telephone number the following day, the number had been disconnected.  Analysis of subscriber information for telephone number (626) 840-0720 revealed that this number was registered to C. Kallas at the time of Ms. Marroquin's telephone

18

call.

     f.   Ms. Marroquin and Ms. Garcia then called C.
Kallas' office number provided to them by Ms. Gamba.  Ms.
Marroquin recognized the voice of the individual answering the
telephone to be the same as that of the individual who answered
the telephone when she called the cellular number provided by Ms.
Gamba.  The individual answering the telephone told Ms. Marroquin
she had the wrong person and to never call again.

    31.  In reviewing Ms. Marroquin's A-File, AXXXXX4010, I
discovered a general query printout from the National File
Tracking System (NFTS).  The query shows that Ms. Marroquin's
original A-File was reported lost by C. Kallas on November 29,
2005.  On March 23, 2008, I contacted Cheryl Fisher, Intelligence
Research Specialist, from the USCIS Texas Fraud Detection Unit
and asked her about this file.  Ms. Fisher told me that according
to the NFTS, a person named "Palacios" requested the above
mentioned file on March 31, 2005.  "Palacios" has been identified
as a legal assistant in the office where C. Kallas is employed.
On April 5, 2005, the file was reassigned to C. Kallas.  On
November 29, 2005, C. Kallas reported the file lost.

    32.  On April 12, 2007, CS provided me with copies of email
messages he received from the Kallases from an email address of
"laimmigration@hotmail.com."

    a.   One of these email messages was sent to CS on

October 22, 2006, and was titled "money orders."  The message stated in pertinent part: "Also I got the lump sum fee of $3000 for Hilda and Jose Luis Parades, but the total fees added up to $3,880."

      b.   A second email message dated October 24, 2006 titled "Express Mail," stated in pertinent part: "I received $3,000 for Jose Luis Parades and Hilda together, but the total cost of their filing fees was $3860.00, which makes it $860.00 short."

### E.   Registered Mail Boxes

33.  On January 30, 2008, I learned that the Kallases and A. Fisco have three post office boxes registered in their names at two local post offices.

      a.   Post office boxes 9275 and 1275 are both located at 6649 Amethyst Street, Alta Loma, California.  This post office is located across the street from A. Fisco's residence, located at 6638 Amethyst Avenue, Apartment C-205, Rancho Cucamonga, California, 91737, (Fisco residence).  Post office box 4637 is located at 10950 Arrow Route, Rancho Cucamonga, California.

      b.   Post office box 9275 was registered on May 9, 2007, in the name of "Botno Inc. - SweetLife."  The name of the applicant is listed as "Maria Kallas (President)" and the address provided is that of the Kallas residence.  M. Kallas provided her driver's license and car insurance as proof of her identity.  M.

Kallas also listed C. Kallas and A. Fisco as authorized representatives on this mailbox.

   c. Post office box 1275 was registered on December 7, 2005, in the name of "M. Kallas, president of Sweetlife and Botno Inc."

   d. Post office box 4637 was registered on November 13, 2006 in the names of A. Fisco and C. Kallas.  The registration card also listed A. Fisco as the president of MVCI and provided the address of the Fisco residence and an email address of laimmigration@hotmail.com.

  **F.** **DOL ETA 9089**

  34. During the April 12, 2007, interview with CS, CS provided me with documents relating to the immigration scheme. Among the documents CS provided were two copies of letters from DOL ETA.  These letters accompanied certified ETA 9089s, which once received by the petitioning employer, are then sent with a completed I-140 petition to USCIS.  The letters list the ETA case number, the employing company's name and address, the alien's name, and the position the alien will occupy.  On both letters provided to me by CS, the company listed is Botno Inc.  The name of the two aliens listed in each letter is Manuel Arturo Rosas and Christian Miguel Chamorro, described further in this affidavit.

  35. On or about April 20, 2007, I contacted Rob Jordan at

the DOL, Office of Foreign Labor Certification and provided him
with the name of the employer, Botno Inc., sponsoring the
undocumented aliens listed in the certification letters.  In May
2007, Mr. Jordan sent me approximately thirty-five DOL ETA 9089s
filed by Botno Inc., on behalf of undocumented aliens from
September 2005 to October 2006.  In the list provided by Mr.
Jordan, I was unable to find any DOL ETA 9089 filed for any
aliens legally residing in the United States.

36.  Contained within the ETA 9089 petitions are sections
labeled A through Q.  These sections contain questions for the
purpose of obtaining all relevant information about the
perspective employer and the alien employee.  I reviewed all
copies of ETA 9089s provided by Mr. Jordan and found the
following common information listed in each of the 35 form ETA
9089s:

a.  Section "C" titled "Employer Information
(Headquarters or Main Office)," provides that the sponsoring
employer is Botno Inc., with the business address of 4779 U.S.
20, East Stockton, Illinois.  The form also provides that Botno
Inc., employs one hundred employees.

b.  Section "D" titled (Employer contact information),
provides M. Kallas as the contact person for Botno Inc., with an
address of 10427 Pebble Court, Alta Loma, California, the Kallas
residence, or P.O. box 1275 Alta Loma, California, and phone

22

numbers of (626) 840-0720, or (626) 676-1068, and email addresses

of mithostheelf@hotmail.com, or botnoinc@hotmail.com as the

contact information for the preparer of the petition.  The I-140

petitions accompanying the ETA 9089 petitions also show an email

address of mariakallas@hotmail.com as the contact information for

the preparer of the petition.

        c.   Section "F" titled "Prevailing wage information,"

provides the hourly wage, skill level, and occupational titles.

The occupations in the 35 applications were all listed as skilled

professional employees primarily in positions of management or

supervision.  This section was completed for each ETA 9089.

        d.   Section "H" titled ("Job opportunity

information"), lists the location the work will be performed as

6638 Amethyst Avenue, Apartment C-205, Rancho Cucamonga,

California, 91737, the Fisco residence.  Section "H" also lists

any classified advertisements in newspapers where the position

was advertised.  That section provides that Botno Inc. advertised

the employment vacancy position in the Los Angeles Times and

Inland Valley Daily Bulletin from July 2005 to July 2006.

        e.   Section "J" titled ("Alien information"), lists

the alien's full name, date of birth, current address, country of

citizenship, class of admission (visa), alien admission number

(I-94), and educational information.

        f.   Section "K" titled ("Alien work experience")

23

provides that each of the 35 ETA 9089s provided that the sponsored alien had previous experience for the employment position offered.

    g.   Section "L" titled (Alien declaration), lists the signature of the alien and date, declaring that all information is true and correct under penalty of perjury.

    h.   Section "N" titled ("Employer declaration"), lists the signature of the employer and date, declaring that all information is true and correct under the penalty of perjury. Review of the A-Files revealed that the 35 ETA 9089 forms were all signed by either M. Kallas or A. Fisco.

   37.  In July 2007, while trying to locate A-Files for the aliens listed in the 35 ETA 9089s, I learned that Cheryl Fisher, USCIS Intelligence Research Specialist, from the Texas Fraud Detection Unit was also looking for the same files. I contacted Ms. Fisher who told me that another company by the name of "Mississippi Valley Consulting Inc.," had also filed petitions on behalf of some of the same undocumented aliens as Botno Inc.

   38.  In July 2007, Mr. Jordan sent me ten additional ETA 9089s petitions filed by MVCI on behalf of undocumented aliens from February 2007 to April 2007. Based on my review of these ten forms, I learned the following information:

    a.   In Section "C" of these ten ETA 9089 petitions, the employer's name is listed as "Mississippi Valley Consulting

Inc.," with an address of P.O. box 4637, Rancho Cucamonga, California, telephone number of (909) 481-5230, and an email address of mvconsultinginc@hotmail.com.

      b.   In Section "D" of the ten ETA 9089s, A. Fisco is listed as the contact person for MVCI with an address of P.O. box 4637, Rancho Cucamonga, California, a telephone number of (909) 481-5230, and an email address of mvconsultinginc@hotmail.com.

      c.   Section "H" lists the primary work address as 9600 19th Street, Suite 63, Rancho Cucamonga, California.  That section also provides that MVCI advertised the employment vacancy position in the Los Angeles Times and Inland Valley Daily Bulletin from November 2006 through April 2007.

   39.  On October 30, 2007, I contacted the Los Angeles Times and the Inland Valley Daily Bulletin, and learned that neither Botno Inc., nor MVCI had placed classified ads for employment with either the Los Angeles Times or Inland Valley Daily Bulletin as stated in the ETA 9089 petitions I reviewed.

### G.   **Individuals Identified In The ETA Applications**

#### (1)  **Christian Chamorro**

   40.  Mr. Christian Chamorro ("Mr. Chamorro"), an undocumented alien residing in the United States, is a DOL ETA 9089 applicant sponsored by Botno Inc.  I received a copy of Mr. Chamorro's ETA 9089 petition from DOL.  After reviewing Mr. Chamorro's A-File, OPR SSA Edward Archuleta and I interviewed Mr.

25

Chamorro on July 20, 2007, and learned the following information based on our interview:

      a.   Mr. Chamorro met CS approximately two and a half years prior to the interview date. CS told Mr. Chamorro that he knew an individual who was the head of immigration. CS told him that this individual could help Mr. Chamorro with his immigration issues for a fee of $20,000.00. Mr. Chamorro never met the individual that CS described as the head of Immigration, but was told by CS that this individual's name was Constantine Kallas.

      b.   After his conversation with CS, on or about June 2005, Mr. Chamorro provided CS with a copy of his Utah driver's license, his Argentinean birth certificate, Argentinean passport, a copy of his I-94 entry document, and $20,000 dollars in cash. CS in turn provided Mr. Chamorro with a copy of an ETA 9089 petition dated November 29, 2005. CS told Mr. Chamorro that the company listed in the ETA 9089, Botno Inc., would serve as Mr. Chamorro's sponsoring company. CS also told Mr. Chamorro that Botno Inc., was M. Kallas' company. Mr. Chamorro had never worked for or received a payment from Botno Inc.

      c.   Mr. Chamorro did not hear anything regarding his immigration petitions until receiving letters from USCIS stating that his immigration petitions had been denied. After receiving these letters, Mr. Chamorro told CS that he wanted to meet C. Kallas. CS refused to provide Mr. Chamorro with C. Kallas'

contact information or facilitate such a meeting.

41.   Based on my review of Mr. Chamorro's A-file, I learned the following information:

a.   On or about October 7, 2005, M. Kallas electronically submitted an ETA 9089, and signed a certified ETA 9089 on or about July 21, 2006.

b.   M. Kallas signed the I-140 Petition on or about July 21, 2006.

c.   On or about July 21, 2006, M. Kallas signed the I-485 Petition.

d.   On or about July 24, 2006, M. Kallas submitted the following documents to USCIS on behalf of Mr. Chamorro: (1) the I-140 Petition; (2) the I-485 Petition; (3) the signed ETA 9089; (4) Articles of incorporation for Botno Inc.; (5) State of Illinois annual corporate report showing the transfer of sole ownership of Botno Inc., from Peter Kallas to M. Kallas; (6) The 2002, 2003 and 2004 tax returns for Botno Inc.; a letter addressed to USCIS adjudications signed by M. Kallas on Botno Inc., letterhead; (8) Mr. Chamorro's foreign diploma; (9) Mr. Chamorro's Utah driver's license; and (10) copy of Mr. Chamorro's Argentinean passport.

42.   Also contained in Mr. Chamorro's A-File was a cut out label from a United States Postal Service envelope sent to USCIS with the name "Maria Kallas" and the address, 10427 Pebble Court,

Alta Loma, California, 91737, the Kallas residence, handwritten as the sender and USCIS Nebraska Service Center, P.O. Box 87485, Lincoln NE, 68501-7485 as the recipient of the packet.

43.   On February 6, 2008, CS told SSA Blossom and I that after Mr. Chamorro gave CS the $20,000.00 and the documents, CS drove to the Kallas residence, and gave the $20,000.00 to M. Kallas and the documents to C. Kallas.

### (2)  Luis Paredes

44.   Mr. Luis Paredes ("Mr. Paredes"), an undocumented alien residing in the United States, is one of the DOL ETA 9089 applicants sponsored by Botno Inc.  I received a copy of Mr. Paredes' ETA 9089 petition from DOL.  SSA Archuleta and I interviewed Mr. Paredes on July 19, 2007, and learned the following information based on our interview:

a.   Approximately two years prior to the interview date, Mr. Paredes was refinancing his house with a company named Dimension Properties.  A female real estate associate named Ruth Gaimaro ("Ms. Gaimaro"), asked about his immigration status and stated that her friend, CS, could help Mr. Paredes with his immigration issues.

b.   CS told Mr. Paredes that he could help Mr. Paredes get a permanent residency card within 6 months for $20,000.00 in cash.  Mr. Paredes offered to pay half the amount after he received the temporary residency card, but CS stated that he

28

needed the entire amount up front.  CS told Mr. Paredes that the
individual who was receiving Mr. Paredes' documents and money was
the second in command of the immigration office in Los Angeles,
however all transactions were to be conducted through CS.  Mr.
Paredes gave CS $20,000.00 in cash along with the required photos
for USCIS and a copy of Mr. Paredes' birth certificate.

    c.   Mr. Paredes did not receive any immigration
benefits from his payment to CS.  During the interview, I showed
Mr. Paredes a copy of an ETA 9089 petition, I received from DOL,
filed by Botno Inc., on behalf of Mr. Paredes, with M. Kallas'
name appearing as president of Botno Inc.  The ETA 9089 provided
that Mr. Paredes worked as a computer engineer for Botno Inc.
Mr. Paredes stated that he had neither been employed, nor been
paid by Botno Inc.  As of the writing of this affidavit, I have
been unable to locate Mr. Paredes' A-File.

45.  On February 6, 2008, CS advised SSA Blossom and I that
after Mr. Paredes gave him the $20,000 and documents, CS drove to
the Kallas residence, and gave the $20,000 to M. Kallas and the
documents to C. Kallas.

### (3)  Daniel Garcia

46.  Daniel Garcia ("Mr. Garcia"), an undocumented alien
residing in the United States, was a DOL ETA 9089 applicant
sponsored by Claudio Electric.  I received a copy of Mr. Garcia's
ETA 9089 petition from DOL.  After reviewing Mr. Garcia's A-File,

29

SSA Blossom and I interviewed Mr. Garcia on October 12, 2007, and learned the following information based on our interview:

a.   Mr. Garcia met CS in approximately December 2005. CS told Mr Garcia that his friend, "Constantine Kallas," worked for INS and could get a permanent residency card for Mr. Garcia within six months.  CS showed Mr. Garcia a business card with C. Kallas' name on it and told Mr. Garcia that because Mr. Garcia had a company sponsor, Claudio Electric, the fee for obtaining his permanent residency status would be $16,000.00 rather than $20,000.00.

b.   After their initial meeting, Mr. Garcia again met with CS and provided him with $16,000.00.00 in cash and numerous copies of documents as requested by CS.  CS specifically told Mr. Garcia that he would take the money to C. Kallas.

47.   Upon reviewing Mr. Garcia's A-file, I learned that on or about October 22, 2005, an ETA 9089 was filed on behalf of Mr. Garcia.  "Claudio Vechhi," from Claudio Electric, the sponsoring employer, signed the ETA 9089 petition on December 12, 2005.

48.   On December 10, 2007, I contacted Mr. Garcia and confirmed that his employer, Claudio Vechhi, did sign the ETA 9089.  Mr. Garcia told me that Claudio Vechhi received the ETA 9089 petition from DOL, signed it, and then gave it to Mr. Garcia.  Mr. Garcia then gave the form to CS.  An I-140 and an I-485 were each filed on behalf of Mr. Garcia, however, each was

denied by USCIS on August 15, 2006.

49.   On February 6, 2008, CS told SSA Blossom and I, that upon receiving the $16,000.00 and documents from Mr. Garcia, he drove to the Kallas residence, and gave the $16,000.00 dollars to M. Kallas and the documents to C. Kallas.

50.   On April 12, 2007, CS provided me with a copy of an email message he received from the Kallases on October 25, 2006 from the email address "laimmigration@hotmail.com."  The email stated in pertinent part: "Further, Ceasr Daniel Garcia just got his new labor cert approved and it will be mailed to his employer Claudio Vecchi.  This new labor cert will give him the green card like Suarez Mendoza above."

### (4)   Manuel Rosas

51.   Manuel Rosas ("Mr. Rosas"), an undocumented alien residing in the United States, is one of the DOL ETA 9089 applicants sponsored by Botno Inc.  I received a copy of Mr. Garcia's ETA 9089 petition from DOL.  After reviewing his A-File, SSA Blossom and I interviewed Mr. Rosas on October 31, 2007, and the learned the following information from our interview:

a.   Mr. Rosas was introduced to CS in February or March of 2006, and met with CS to discuss his immigration matter.

b.   CS told Mr. Rosas that he knew of a high level immigration official, but did not give Mr. Rosas the immigration official's name.  CS told Mr. Rosas that the immigration official

31

could speed up his "Green Card" process for a fee. CS told Mr. Rosas that he and his wife could receive their "Green Cards" in three to six months.

   c. Approximately one week after meeting with CS at his residence, Mr. Rosas and his wife provided CS $16,000.00 in cash, copies of tax returns, passports, driver's licenses, birth certificates and Ms. Rosas' college diploma.

   d. Approximately two weeks after providing the documents and money, Mr. Rosas received a call from CS stating that "they" could not help his wife, however, Mr. Rosas' application would be moving forward instead.

   e. In September 2006, Mr. Rosas received a temporary work authorization card, which was valid until September 2007. On or about late December of 2006, CS provided Mr. Rosas with a blank ETA 9089 and a I-485 Petition. Mr. Rosas signed the petitions and returned them to CS.

   f. Thereafter, Mr. Rosas called CS on numerous occasions for a status on his case. Each time Mr. Rosas spoke to CS about the status of his immigration matter, CS told Mr. Rosas that "his guy" was in Chicago or New York. In February 2007, Mr. Rosas contacted CS, but CS's telephone had been disconnected.

   g. During my interview with Mr. Rosas, I showed Mr. Rosas his A-File, which contained a university diploma from Mexico. Mr. Rosas told us that the copy of the diploma in his A-

File was not his and he did not have a college degree.  Mr. Rosas
stated that the diploma in the A-file was his wife's, but someone
had transposed his name over his wife's name instead.

52.  During a telephone interview with Mr. Rosas on December
10, 2007, Mr. Rosas told me that he never worked for, or received
anything from Botno Inc.  Mr. Rosas stated that he and his wife
both work for Decocal Inc., a multi level marketing company.

53.  After reviewing Mr. Rosas' A-file, I learned the
following information:

a.  On or about July 5, 2006, M. Kallas electronically
submitted an ETA 9089, and signed a certified ETA 9089 on or
about August 12, 2006;

b.  On or about August 12, 2006, M. Kallas signed an
I-140 Petition;

c.  On or about August 19, 2006, M. Kallas submitted
to USCIS the following documents among others: (1) I-140
Petition; (2) I-485 Petition; (3) a signed ETA 9089; (4) articles
of incorporation for Botno Inc.; (5) State of Illinois annual
corporate report, showing the transfer of sole ownership of Botno
Inc., from Peter Kallas to M. Kallas; (6) Botno Inc., tax returns
for the years 2002, 2003, and 2004; (7) a letter addressed to
USCIS adjudications signed by "Maria Kallas;" (8) a copy of a
foreign diploma issued to Mr. Rosas; and (9) California driver's
license in Mr. Rosas' name.

54. Also contained in Mr. Rosas's A-File is a cut out label from a United States Postal Service envelope sent to USCIS with the name "Maria Kallas" and the address, 10427 Pebble Court, Alta Loma, California 91737, the Kallas residence, handwritten as the sender and USCIS Nebraska Service Center, P.O. Box 87485, Lincoln NE, 68501-7485 as the intended recipient of the packet.

55. On February 6, 2008, CS told SSA Blossom and I that after Mr. Rosas gave him the documents and $16,000.00 in cash, he drove to the Kallas residence, and gave the $16,000.00 to M. Kallas and the documents to C. Kallas.

56. On April 12, 2007, CS provided me with copies of email messages he received from the Kallases.

    a. One of these messages was sent on November 29, 2006 from the email address of "laimmigration@hotmail.com" titled "Manuel Rosas." The email stated, in pertinent part: "I can file for his wife, Ana Veladez, under a totally new company that I already set up, using her degree etc. That way, she can now get work authorization and advance parole and her husband, Manuel will get his green card as a derivative through her. Of course this means that we just won't pursue Manuel's application now. I recommend this, so let me know what you think."

    b. A second email, sent on December 11, 2006, from email address "laimmigration@hotmail.com," titled "rosas" stated: "Manuel Rosas' deadline is 12/18/06. I did not get any documents

34

for him yet. Let me know what you plan to do now."

**H.    Deposit of Funds from Undocumented Aliens Into Accounts
Used by the Kallases and A. Fisco**

57.   I reviewed, on various dates, information received from
Washington Mutual Bank accounts used by the Kallases and A.
Fisco.  From those bank records, I identified deposits of
personal checks from the accounts of various undocumented aliens,
as identified through my review of their A-files.

**(1)   Rodrigo Moreno Bala**

58.   I reviewed A-File Axxxx6475 for Rodrigo Moreno Bala
(Mr. Bala) and learned the following information:

a.    On or about February 19, 2006, M. Kallas
electronically submitted an ETA 9089, and signed the certified
ETA 9089 on or about July 22, 2006.

b.    On or about July 23, 2006, M. Kallas signed the I-
140 Petition.

c.    On or about July 26, 2006, M. Kallas submitted,
among other documents to USCIS: (1) the I-140 Petition, I-485
Petition, and signed ETA 9089; (2) articles of incorporation for
Botno Inc.; (3) State of Illinois annual corporate report,
showing the transfer of sole ownership of Botno Inc., from Peter
Kallas to M. Kallas; (4) Botno Inc., tax returns for the years
2002, 2003, and 2004; (5) a letter addressed to USCIS
adjudications signed by M. Kallas; (6) a foreign diploma in the
name of Rodrigo Moreno Bala; and (7) a copy of Mr Bala's

35

passport.

59.   Also contained in A-File Axxxx6475 is a copy of a cut
out label from a United States Postal Service envelope sent to
USCIS with the name "Maria Kallas" and an address of "10427
Pebble Court, Alta Loma, California 91737," the Kallas residence,
handwritten as the sender and USCIS Nebraska Service Center, P.O.
Box 87485, Lincoln NE, 68501-7485 as the intended recipient of
the packet.

60.   I also reviewed bank records from Washington Mutual
Bank account number xxxxxx4610, in the names of Constantine and
Maria Kallas and found four checks, including check numbers 471,
472, 485, and 506, totaling $10,500, written from a Washington
Mutual Bank account, in the name of Rodrigo Moreno, written to
the name of "Maria Kallas."

61.   Check number 471, dated July 17, 2004, is in the amount
of $3,000.00; check number 472, dated July 17, 2004, is in the
amount of $500.00; check number 485, dated July 29, 2004, is in
the amount of $4,000.00; check number 506, dated September 20,
2004, is in the amount of $3,000.00.   The bank records show that
all four checks were deposited into the Washington Mutual Bank
checking account, number xxxxxx4610, between July 19, 2004, and
September 25, 2004.

62.   I also reviewed bank records from Washington Mutual
Bank account number xxxxxx7850, in the name of A. Fisco and found

36

check number 607, written from a Washington Mutual Bank account, in the name of Rodrigo Moreno, written to A. Fisco. The check is in the amount of $3,000.00 dollars. Bank records show that the check was deposited into A. Fisco's Washington Mutual Bank account xxxxxx7850 on August 22, 2005.

**(2)  Marco Antonio Gomez**

63.  I reviewed A-File Axxxx5064 for Marco Antonio Gomez and learned the following information:

a.  On or about March 1, 2007, A. Fisco electronically submitted an ETA 9089, and signed a certified ETA 9089 on or about April 6, 2007.

b.  On or about April 6, 2007, A. Fisco signed the I-140 Petition.

c.  On or about May 1, 2007, A. Fisco submitted among other documents: (1) I-140 Petition, (2) I-485 Petition, (3) a signed ETA 9089, (4) a signed and dated certified ETA Form 9089; (5) The state of Illinois articles of incorporation for MVCI; (6) unsigned federal tax returns for 2003, 2004 and 2005 for MVCI; (7) a 2006 federal tax return for MVCI, signed by A. Fisco on March 12, 2007; (8) an annual corporate report, dated February 20, 2006, showing A. Fisco as president of MVCI, as of January 11, 2007, with an address of "Post Office Box 4637 and 9600 19th Street, Suite 63, Rancho Cucamonga, California"; (9) a letter to USCIS adjudications signed by A. Fisco, dated April 5, 2007, and

37

a copy of California driver's license number xxx2894, in the name
of Marco Antonio Gomez to USCIS.

64.  I also reviewed records from Washington Mutual Bank
account number xxxxxx7486, in the name of Lucia Anolis and found
a cash deposit slip, which came from a Washington Mutual Bank,
account number xxxxxx4107, in the name of Marco A. Gomez.  The
cash deposit was in the amount of $5,000.00 dollars and was dated
October 24, 2006.  A California driver's license number xxxx2894
was provided as identification for the transaction.  This is the
same California driver's license number I found in Marco Gomez's
A-File.

65.  Also contained in A-File Axxxx5064 is a cut out label
from a United States Postal Service envelope sent to USCIS with
the name A. Fisco and the address, "P.O. Box 4637, Rancho
Cucamonga California 91729" handwritten as the sender and USCIS
Nebraska Service Center, P.O. Box 87485, Lincoln NE, 68501-7485
as the receiver of the packet.

### (3)  Lelimar Menedez Cobis

66.  I reviewed A-File Txxxxx3151 for Lelimar Menedez Cobis
and learned the following information:

a.   On or about February 12, 2007, A. Fisco
electronically submitted ETA 9089, and signed the certified ETA
9089 on or about February 22, 2007.

b.   On or about March 10, 2007, A. Fisco signed the I-

38

140 Petition.

c.   On or about March 13, 2007, A. Fisco submitted, among other documents to USCIS: (1) I-140 Petition, (2) I-485 Petition, (3) signed ETA 9089, (4) signed and dated certified ETA Forms 9089; (5) State of Illinois articles of incorporation for MVCI; (6) unsigned MVCI federal tax returns for 2003, 2004 and 2005; (7) an annual corporate report, dated February 20, 2006, showing A. Fisco as president of MVCI, as of January 11, 2007, with an address of Post Office Box 4637 and 9600 19th Street, Suite 63, Rancho Cucamonga, California.

f.   Also contained in A-File Txxxxx3151 is a cut out label from a United States Postal Service envelope sent to USCIS with the name "A. Fisco" and the address, MVCI, P.O. Box 4637, Rancho Cucamonga, California, 91729 handwritten as the sender and USCIS Nebraska Service Center, P.O. Box 87485, Lincoln NE, 68501-7485 as the receiver of the packet.

g.   Ms. Cobis' I-485 Petition lists Sergio Escalona as her husband.  Both I-485 Petitions for Lelimar Menedez Cobis and Sergio Escalona also show the same residential address at 3411 Cardinal Feather Drive, Land O' Lakes Florida.

67.  I reviewed bank records from Washington Mutual Bank account number xxxxxx7486, in the name of Lucia Anolis and found a Commercebank check number 116, dated October 4, 2005, in the amount of $17,000.00 made payable to "Lucia Anolis."  In the

39

upper left-hand corner is the name Sergio Escalona.  The
following was written on the back of check number 116: "for
deposit only [xxxxxx]7486."

### (4) Sergio Escalona

68.   On May 22, 2008 SSA Blossom and I interviewed Sergio
Escalona and learned the following information from our
interview:

a.   Escalona stated that he was introduced to the
Kallas' by a relative of the Kallas' residing in Venezuela.
Escalona contacted M. Kallas and spoke to her about his
immigration case.

b.   During that conversation, M. Kallas told Escalona
that her husband worked for immigration and would take care of
everything.  M. Kallas also stated that "they" had a company
which could sponsor Escalona for his work authorization and
adjustment of status.

c.   M. Kallas told Escalona that the fee would be
$17,000.00.

d.   After the conversation, Escalona mailed copies of
his passport, diploma, and driver's license, to the Kallas'.

e.   Upon arriving in the United States on October of
2005, Escalona deposited the $17,000.00 check in a Washington
Mutual Bank account as instructed by M. Kallas.

f.   In December of 2005, Escalona and his wife flew to

40

Ontario, California, where they were picked up by C. Kallas and spent the night at the Kallas home.  The following morning, C. Kallas drove Escalona and his wife to an unknown immigration building where Escalona and his wife were fingerprinted.

### (5)  Gerardo Parrillo Marquez

69.  I reviewed A-File xxxx5014 for Gerardo Parrillo Marquez (Mr. "Marquez") and learned the following information:

a.    On or about May 29, 2006, M. Kallas electronically submitted an ETA 9089, and signed a certified ETA 9089 on or about June 15, 2006 on behalf of Mr. Marquez.

b.    On or about June 15, 2006, M. Kallas signed the I-140 Petition.

c.    On or about June 16, 2006, M. Kallas submitted to USCIS, among other documents: (1) I-140 Petition, (2) I-485 Petition, (3) signed ETA 9089; (4) articles of incorporation for Botno Inc.; (5) State of Illinois annual corporate report, showing the transfer of sole ownership of Botno Inc., from Peter Kallas to Maria Kallas; (6) Botno Inc., tax returns for the years 2002, 2003, and 2004; (7) a letter addressed to USCIS adjudications signed by M. Kallas; (8) a foreign diploma in the name of Gerardo Parillo Marquez; and (9) a copy of Mr. Marquez's passport.

d.    The I-485 Petition also lists Leomar Menendez Cobis as Mr. Marquez's wife.

41

70.   Also contained in A-File Axxxx5014 is a copy of a cut
out label from a United States Postal Service envelope sent to
USCIS with the name "Kallas" and an address of 10427 Pebble
Court, Alta Loma, California, 91737, the Kallas residence,
handwritten as the sender and USCIS Nebraska Service Center, P.O.
Box 87485, Lincoln NE, 68501-7485 as the receiver of the packet.

71.   On May 22, 2008, SSA Blossom and I interviewed Mr.
Marquez and learned the following information form our interview:

a.   Mr. Marquez was introduced to the Kallases through
Sergio Escalona.  Mr. Marquez stated that M. Kallas told Mr.
Marquez during a telephone conversation that his immigration case
was not problematic and that her husband was an attorney who
worked for Immigration.

b.   Mr. Marquez stated that he sent a copy of his
passport, driver's license and diploma to M. Kallas.

c.   Mr. Marquez stated that he is married to Leomar
Mendez Cobis and has never been employed by Botno Inc.

### (6)  Leomar Menendez Cobis

72.   I reviewed A-File Axxxx5015 for Leomar Menendez Cobis
and learned the following information:

a.   On or about February 12, 2007, A. Fisco
electronically submitted an ETA 9089, and signed a certified ETA
9089 on or about February 24, 2007.

b.   On or about March 15, 2007, A. Fisco signed the I-

42

140 Petition.

c.   On or about May 27, 2007, A. Fisco submitted to USCIS, among other documents: (1) I-140 Petition, (2) I-485 Petition, (3) signed ETA 9089, (4) signed and dated certified ETA Forms 9089; (5) State of Illinois articles of incorporation for MVCI; (6) unsigned MVCI federal tax returns for 2003, 2004, and 2005, and a 2006 federal tax return for an S corporation, signed by A. Fisco, dated March 12, 2007; (7) an annual corporate report, dated February 20, 2006, showing A. Fisco as president of MVCI from January 11, 2007, with an address of Post Office Box 4637, Rancho Cucamonga, California; (8) a letter to USCIS adjudications signed by A. Fisco, dated March 15, 2007.

73.   Also contained in A-File Axxxx5015 is a copy of a cut out label from a United States Postal Service envelope sent to USCIS with the name "A. Fisco" and an address of P.O. box 4637 Rancho Cucamonga, California, 91737 handwritten as the sender and USCIS Nebraska Service Center, P.O. Box 87485, Lincoln NE, 68501-7485 as the receiver of the packet.

74.   I reviewed Bank records from Washington Mutual Bank account number xxxxxx7486, in the name of Lucia Anolis, and learned the following information:

a.   Three checks payable to "Lucia Anolis," check numbers 177, 101, and 102 totaling $16,685.00, were deposited into account number 7486.  Check number 177, dated May 26, 2006,

43

is in the amount of $2,000.00; check number 101, dated May 26, 2006, is in the amount of $11,000.00; and check number 102, dated June 14, 2006, is in the amount of $1,685.   In the upper left-hand corner of check number 177 are the names Leomir and Leonardo Menendez, with an address of 11403 Shallowbrook Pl., Tampa Florida.   In the upper left-hand corner of check number 101 and 102 are the names Gerardo Parrillo and Leomar Menendez, with an address of 11403 Shallowbrook Pl., Tampa Florida.   The words "for deposit only xxxxxx7486" were handwritten on the back of check numbers 177 and 101.

### (7)  Hennry Neftali De Leon

75.   I reviewed A-File Axxxx8616 for Hennry Neftali De Leon and learned the following information:

a.   On or about October 3, 2005, M. Kallas electronically submitted an  ETA 9089, and signed a certified ETA 9089 on or about March 15, 2006.

b.   On or about March 27, 2006, M. Kallas signed the I-140 Petition.

c.   On or about June 16, 2006, M. Kallas submitted to USCIS, among other documents: (1) I-140 Petition, (2) I-485 Petition, (3) a signed ETA 9089; (4) articles of incorporation for Botno Inc.; (5) State of Illinois annual corporate report showing the transfer of sole ownership of Botno Inc., from Peter Kallas to M. Kallas; (6) Botno Inc., tax returns for the years

44

2002, 2003, and 2004; (7) a letter addressed to USCIS adjudications signed by M. Kallas, and a copy of Hennry Neftali De Leon's foreign diploma.

       d.    Also contained in A-File Axxxx6475 are two cut out labels from United States Postal Service envelope sent to USCIS with the name "Kallas" and an address of 10427 Pebble Court, Alta Loma, California, 91737, the Kallas residence, and A. Fisco, MVCI, P.O. Box 4637, Rancho Cucamonga, California, 91729, handwritten as the sender and USCIS Nebraska Service Center, P.O. Box 87485, Lincoln NE, 68501-7485 as the receiver of the packet.

      76.  I reviewed bank records from Washington Mutual Bank account number xxxxxx4610, in the names of C. Kallas and M. Kallas and found three checks, check numbers: 218, 219, and 220 made payable to "Maria Kallas," written from a Bank of America account, in the name of Hennry Neftali De Leon. All three checks are dated June 10, 2007,and are in the same amount - $4,160.00. All three checks have M. Kallas' signature on the endorsement line, on the back of the checks.

      77.  On May 29, 2008, I was contacted by Marie, an employee at the Alta Loma Post Office where the Kallases and A. Fisco maintain a P.O. box and was informed that an express mail package had arrived addressed to Botno Inc., P.O. Box 9275, Rancho Cucamonga, California, 91701. Marie stated that the package was from an individual named Henry De Leon.

78.   On May 30, 2008, I went to the Alta Loma post office and viewed the envelope, which had arrived the day before on May 29, 2008.   I observed, handwritten on the package, the recipient address of Botno Inc. P.O. Box 9275, Rancho Cucamonga, California, 91701.   I also observed the sender's information handwritten on the package as: Hennry De Leon, 219 S. 19th Street, Richmond, California, 94804.

79.   On June 2, 2008, I received a telephone call form Marie who stated that at approximately 3:30 p.m., a female individual retrieved the package. I received the security video tape and receipt from the Alta Loma post office on June 3, 2008.   On the receipt, the name "Maria" was hand written in the signature section.

80.   On June 4, 2008, I reviewed the security video tape and saw a female that appeared to be M. Kallas signing for and picking up the package.

### (8)   Fiorella Curtopelle

81.   On or about March 17, 2008, I reviewed Bank of America documents for account number xxxxxx1430 in the name of A. Fisco. The signature card shows that A. Fisco opened this account on September 28, 2006.   M. Kallas is also listed on the account as having signatory authority.   In reviewing the account, I found check number 1010, dated March 12, 2007 written against the account in the amount of $15,000.00 made payable to Fiorella

46

Curtopelle.  At the top of the check, "Paid In Full" is also handwritten and the check is signed by A. Fisco.

82.   I have reviewed A-File, xxxxx1767 in the name of Fiorella Curtopelle ("Ms. Curtopelle") and learned the following information:

a.   On or about February 18, 2006, M. Kallas electronically submitted an ETA 9089, and signed a certified ETA 9089 on or about June 6, 2006.

b.   On or about June 5, 2006, M. Kallas signed the I-140 Petition.

c.   On or about June 9, 2006, M. Kallas submitted to USCIS among other documents: (1) the I-140 Petition, (2) I-485 Petition, (3) signed ETA 9089; (4) articles of incorporation for Botno Inc.; (5) State of Illinois annual corporate report, showing the transfer of sole ownership of Botno Inc., from Peter Kallas to M. Kallas; (6) Botno Inc., tax returns for the year 2002, 2003 and 2004; (7) a letter addressed to USCIS adjudications signed by M. Kallas; (8) a foreign diploma, and a copy of Ms. Curtopelle's passport.

83.   Also contained in A-File Axxxx1767 is a copy of a cut out label from a United States Postal Service envelope sent to USCIS with the name M. Kallas and an address of 10427 Pebble Court, Alta Loma, California, 91737, the Kallas residence, handwritten as the sender and USCIS Nebraska Service Center, P.O.

47

Box 87485, Lincoln NE, 68501-7485 as the receiver of the packet.

84. On May 21, 2008, I along with SSA Blossom interviewed Ms. Curtopelle and learned the following information from our interview:

a. Ms. Curtopelle met the Kallases in February or March of 2006 to discuss her immigration status. C. Kallas told Ms. Curtopelle that he used to work for immigration and is now an attorney with a construction company that can sponsor her for work authorization in the United States. C. Kallas then provided Ms. Curtopelle with a business card that read: Department of Homeland Security, U.S. Immigration and Customs Enforcement, "Constantine Kallas, Assistant Chief Counsel" with the telephone number of (213) 894-2128.

b. Ms. Curtopelle then gave the Kallases a check in the amount of $23,000.00 as payment for her immigration case. Ms. Curtopelle provided SSA Blossom and I with a copy of check number 127, dated February 14, 2006, in the amount of $23,000.00 written to "Maria Kallas."

c. After that meeting, Ms. Curtopelle recalled faxing documents to the Kallases for her immigration case. Ms. Curtopelle also recalled receiving blank documents faxed from the Kallases which she also signed and returned to them.

d. Ms. Curtopelle's application was ultimately denied because she did not possess an advanced degree. Ms. Curtopelle

48

told M. Kallas that she could return to school to obtain her "master's degree." However, M. Kallas replied that "they" can create a document showing that she had already obtained such a degree.

     e.   After the denial of her initial immigration application submitted by the Kallases, Ms. Curtopelle received an email from the Kallases. Ms. Curtopelle then provided SSA Blossom and I with a copy of the email dated March 15, 2007. Just as the emails provided by CS, this email was also sent from laimmigration@hotmail.com.

     f.   The email message stated that "I already have the new labor certification approved with a different company . . . ." "I understand that you do not want to reapply and you hired an immigration lawyer in Miami. You also wanted a refund for the unspent portions of your case. If that is your decision, please let me know so I can send you a check to close this matter. I really feel that I went out of my way on your case and spent much more time than normal. We answered your phone calls at any hour and appreciate your help in gathering documents."

### I.   **Documents Recovered from the Kallas Residence Trash**

    85.  On February 6, 2008, SSA Blossom and I recovered the trash from the Kallas residence. Among the items contained in the Kallases trash was a typed letter to Pepperwood Apartments, dated January 18, 2008. The letter is typed on a page with a

MVCI letterhead.  The letterhead appears in typed red and blue letters with black shading.  There is also a thin black border on the outside of the letter.  In the letter, M. Kallas identifies herself as the president of MVCI and provides verification of A. Fisco's income.

86.  The letter also states that A. Fisco is M. Kallas' administrative assistant in a permanent capacity, who has worked for MVCI for many years.  The letter provides that M. Kallas' position as the human resource manager with the contact number of (909) 229-1987.

87.  Contained in the above-mentioned A-Files, specifically A-File Axxxx5015 for Leomar Menendez Cobis, A-File Txxxxx3151 for Lelimar Menedez Cobis, and A-File Axxxx5064 for Marco Antonio Gomez, are letters with the same letterhead style and coloring of MVCI and same black border.  Those letters are addressed to USCIS and signed by A. Fisco, president of MVCI.

88.  On February 8, 2008, I went to the Pepperwood apartments, a low-income housing complex, and spoke to the property manager, Kourtney Law, who told me that in January 2008, A. Fisco and M. Kallas came in and filled out a rental application.  Ms. Law provided me with a copy of the rental application which stated that A. Fisco had been employed with MVCI from September 1999 to the present, and earns a salary of $1,300 a month.  The contact phone number listed on the

50

application is (909) 229-1987, the same number provided in the letter to Pepperwood apartments as referenced above.

89.  I reviewed a previously obtained DOL Form CA-7, claim for compensation, completed by C. Kallas due to an injury he sustained while at work on January 17, 2007.  Form CA-7 signed by C. Kallas also has the phone number of (909) 229-1987 handwritten as his contact phone number.

90.  Among the items recovered from the Kallas residence trash was a bank statement from Bank of America account number xxxxxx1430, in the name of A. Fisco, with an address of 6638 Amethyst Street apt. C205, Alta Loma, California, A. Fisco residence.

91.  On February 13, 2008, SSA Blossom told me that he recovered the trash from the Kallas residence.  Contained in the trash, among other documents, was a copy of a page from a Federal tax return form 1120 for a United States corporation.  M. Kallas' name is typed on the left side of the tax return, followed by her Social Security number, xxx-xx-7668.  In the upper right hand corner of the page is a Federal Employee Identification Number xx-xxx0080.  Below that, the year 2006 is typed in bold on the form.  Over that is a partially glued white strip of paper with the year 2007 typed in bold.

J.  **A. FISCO's A-File**

92.  I reviewed A. Fisco's A-File, number Axxxxx6189, and

51

found USCIS I-130 (Petition for Alien Relative) and a Form I-864 (Affidavit of Support) filed by the Kallases on her behalf.  On page two, part three of the I-864 form, it lists "Constantine Peter Kallas" as the household member who will provide any and all financial support to A. Fisco.  The form is signed by both M. Kallas and C. Kallas and is dated and notarized on May 16, 2005. Also contained in the A-File are C. Kallas' Federal and State Income tax returns for 2002, 2003, and 2004.  In C. Kallas' 2002 and 2003 Federal and State tax returns, C. Kallas claims M. Kallas, A. Fisco, and Lucia Anolis as dependents.  In the 2004 Federal and State returns, C. Kallas claims M. Kallas and A. Fisco as dependents.  The tax returns are accompanied with C. Kallas' Federal Wage and Tax statement (W-2).  The amount listed on the W-2 is the same amount claimed on each Federal and State tax return.  Also contained in the A-File is C. Kallas' pay stub, showing a total annual salary as of September 17, 2005, to be $105,048.00.

**K.   Federal Bureau of Investigation Information**

93.   On or about June 3, 2008, I spoke to Federal Bureau of Investigation (FBI) Special Agent (SA) David Staab, and learned the following:

a.   On June 03, 2008, SA Staab and FBI SAs Chad Hoffman and Eric Williams contacted and interviewed MS, now a cooperating law enforcement source, at his residence in Oakland,

California.   MS agreed to speak with the agents about his
involvement with the Kallases.   MS knows C. Kallas as the
"Judge," or "Dino," and knows M. Kallas as "Nene."

      b.   MS stated that he met the Kallases through a
friend of his former roommate, Daisy Baires (Baires).   At the
time MS met the Kallases, Baires' friend was employed as a
housekeeper for the Kallases.   MS stated that he had learned that
while Baires was ordered deported, she had paid the "Judge" and
stopped the deportation proceedings.

      c.   MS first met with the Kallases at the Kallas
residence sometime in 2005.   During this visit, MS was taken into
an office located in the "basement" of the residence, by the
Kallases.   MS stated that during the meeting, the "Judge" would
speak to him in English, and M. Kallas would translate what the
"Judge" stated into Spanish.   At one point during the meeting, M.
Kallas translated a statement made by the "Judge" as "the Judge
is clean, had a clean record, and that the FBI was not looking
for him."   MS recalled that the "Judge" had his A-File, when he
arrived at the residence.   MS was surprised that the "Judge" had
his A-file because he had only provided a few identifiers to the
"Judge" prior to the meeting.

      d.   M. Kallas told MS that her husband could resolve
MS's immigration problems, but it would take time.   M. Kallas
also told MS that C. Kallas was a "judge with Immigration."   MS

said M. Kallas gave him the "bleeding heart" story, that her husband was "doing this because he was sad to see families cry, see families get hurt."

     e.   M. Kallas also told MS that she was the owner of a corporation, and that she would help him get a job with that corporation. M. Kallas also told MS that she was in charge of the Immigration office at the Los Angeles Airport.

     f.   MS stated that he paid the "Judge" because he believed C. Kallas was a "judge." The "Judge," who was speaking in English, translated by M. Kallas, told MS that he was going to first get a "work visa," then he, the "Judge," would work on MS's residency status. The "Judge" further told MS not to worry, the paperwork would go straight to his, the "Judge's," house.

     g.   MS paid the Kallases a total of $12,500.00, in periodic payments, which included an initial $500.00 consultation fee for speaking with the "Judge." MS was provided with the Kallases Washington Mutual Bank account number and told to deposit the payments directly into that account, as directed by the Kallases.

     h.   During the same meeting, through M. Kallas' translation while C. Kallas was speaking to MS, the "Judge" also told MS, "I'm a Judge with Immigration; I can take care of your papers. Don't go to a lawyer because a lawyer is only going to take your money."

54

i.   SA Staab showed MS a California driver's license photograph of C. Kallas, without any identifying information.  MS positively identified the photograph of C. Kallas as the "Judge," or "Dino."

j.   SA Staab showed MS a California driver's license photograph of M. Kallas, without any of the identifying information.  MS positively identified the photograph of M. Kallas as "Nene," the wife of the "Judge."

94.  On or about June, 3, 2008, I took part in a joint FBI and ICE surveillance of MS and C. Kallas.

a.   MS voluntarily agreed to wear a concealed body recorder on his person and obtain a consensual monitored conversation with C. Kallas and/or M. Kallas.

b.   MS and ICE SSA Leticia Huerta drove to the Kallas residence, went to the front door of the residence, and knocked on the door.

c.   C. Kallas answered the door, and MS, speaking in broken English, asked C. Kallas if he remembered him.  C. Kallas stated that he did, but it had been a long time, and asked MS what he could do for him.  MS asked about his immigration papers.  C. Kallas replied the ones filed "like five years ago?"

d.   C. Kallas told MS that the papers "expired," and then asked MS if he wanted to start the process all over again.  MS asked C. Kallas what had happened to his $12,000.00 payment.

C. Kallas replied "what do you mean what happened to it? . . . you mean the application fee?"  C. Kallas then stated "you had to do that labor for it, plus the I-140, plus the work authorization . . . , so that wasn't, wasn't that much, really."

     e.  C. Kallas then asked MS if they could speak in private, outside the presence of SSA Huerta.  SSA Huerta then left the porch area of the Kallas residence.  C. Kallas then told MS, in private, that he "filed four years ago. I had your file, I have your file, okay?"  C. Kallas went on to tell MS that MS was "not being deported.  And I filed everything . . . you were gone for two years . . . and the thing's expired.  I can start the process over again but it's, it's a whole different process again you know?"  C. Kallas then told MS "I applied for the visa for work for you as well.  You got that.  You had work authorization.  So you are not being deported, as long as I have your file with me."  "So you're fine.  Uhm, I mean alternative is to return your file back to where it came from, you don't want wanna do that either, right?" "So you're better off the way it is now.  You know what I'm saying?"  C. Kallas went on to say "If we just put everything back the way it was, the bouncing back to immigration, immigration is going to start looking for you and it's going to be a problem.  And it is like starting brand new.  Right now you applied for work authorization . . . you did the labor certification.  So you got something filed for yourself."

     f.   MS then asked C. Kallas if he could start the process over again. C. Kallas replied "Yeah. I, I can start over again." MS asked C. Kallas what the process would cost. C. Kallas replied "Let me get your, you have a number, have my wife call you."

     g.   Later in the conversation, MS asked C. Kallas what happened to his papers. C. Kallas replied "I, I have everything . . . but it's not at my house right now though. I, I don't keep people's papers . . . I don't keep it with me. But the best thing is that your file is not with Immigration right now. You know?" MS then asked C. Kallas if C. Kallas was still working at "Immigration," and C. Kallas replied, "same, same place . . . L.A."

     h.   MS again asked C. Kallas about his papers to which C. Kallas replied " . . . I mean, seriously, I don't have them in my house right now. I keep 'em someplace else. The file I, I have but it's locked up, it's not here."

95.   That evening, June 3, 2008, at approximately 9:13 p.m., M. Kallas called MS on his cell phone. MS identified the number from which M. Kallas was calling from as (909) 203-8230. During the telephone call, M. Kallas told MS the following information:

     a.   The $9,500 MS initially provided and the $1,500 he paid two years thereafter was used to pay for his papers and to move them through the procedure for permanent residency.

M. Kallas told MS that he waited too long to provide the remaining balance of $7,000 which is why the procedure did not work.   During the conversation, MS overheard a second voice in the background who he identified as C. Kallas.   MS overheard M. Kallas asking C. Kallas questions in English during their conversation.

b.   M. Kallas then said that the "Judge" said he could start the procedure again, however, they would need the entire money up-front and it would cost $20,000.00.   M. Kallas then stated that the price had gone up because this procedure was very risky and they already had some trouble with the police.   M. Kallas stated that if they decided to meet, it would be at a McDonald's restaurant rather than meeting at the Kallas residence.

96.   On or about June 18, 2008,   MS placed a consensually monitored telephone call to the Kallases at 909-203-8230.   The call was directed to the voice mail as there was no answer.   MS left a voice message stating that he had the "$20,000 you said it would cost me for my papers, and I'm wondering if you could give me an appointment."

97.   Within approximately 10 minutes of the message, M. Kallas returned MS's phone call from 909-203-8230.

a.   During that call, MS told M. Kallas that he was able to get the $20,000 previously discussed.   M. Kallas asked MS

58

if he "wanted to do the papers again?"  MS replied, "Yes. I need

to because I have not seen my family . . . ."  M. Kallas then

advised MS to "bring everything together, Mario.  All of the

photos and everything together this time don't get lost or

anything."

  b.   Later in the conversation, MS asked M. Kallas if

the "Judge" was present.  M. Kallas replied "No, he is not here."

MS stated that he wanted to talk to him because, "I want to hear

it come from his mouth that he will guarantee my papers."  M.

Kallas replied "Okay, so I will call you once he arrives so you

can speak to him."

  98.  On or about June 24, 2008, MS again placed a

consensually monitored telephone call to the Kallases.  MS left a

message asking if they were going to be able to meet this week so

he, MS, could plan his trip to Los Angeles.

  99.  On or about June 25, 2008, C. Kallas contacted MS at

xxx-xxx-8013, and told MS to meet him on June 26, 2008 at 1:00

p.m. at the "Highland Casino Restaurant."  C. Kallas told MS that

he, C. Kallas, and M. Kallas would both be there and that MS

needed to bring all of the money.  C. Kallas told MS not to be

late and that M. Kallas would call MS later that evening to

confirm the plans.

  100. On June 26, 2008, the Kallases met MS at the San Manuel

Indian Bingo and Casino in Highland, California.  During the

meeting, MS discussed his immigration matter with the Kallases, specifically his work authorization, and provided C. Kallas $20,000 of United States currency.  C. Kallas took the open envelope containing the $20,000 and placed it in his left front cargo pant pocket.

101. Later during the meeting, C. Kallas provided the envelope containing the money to M. Kallas.  M. Kallas placed the envelope in her pouch/fanny-pack and then walked to the women's restroom in the casino.  Approximately 10 to 15 minutes thereafter, M. Kallas returned to the table where MS and C. Kallas were seated.

102. Law enforcement authorities then apprehended C. Kallas and M. Kallas at the San Manuel Indian Bingo and Casino.  As a search incident to M. Kallas' arrest, law enforcement authorities found the currency MS provided to C. Kallas inside M. Kallas' pouch/fanny-pack.  The money, however, had been removed from the envelope.  SA Staab also noted that some of the currency had been separated by denomination using what appeared to be white toilet paper as a divider.

103. Law enforcement authorities executed a federal search warrant of the Kallas residence after arresting C. Kallas and M. Kallas on June 26, 2008.  Among other items, law enforcement authorities recovered $184,000 in cash and 26 individual A-Files located in a hidden floor safe at the Kallas residence.

## L.   **Bank Accounts Used to Launder Proceeds**

104. On various dates I spoke with SSA Blossom and reviewed information from bank accounts used by the Kallases and A. Fisco. From those bank accounts, I learned that the Kallases and A. Fisco deposited approximately $950,000.00 from the year 2000 to the present, excluding C. Kallas' government salary.  The Kallases and A. Fisco laundered the proceeds through bank accounts held in the names of the Kallases, A. Fisco, Irene Fisco, and Lucia Anolis.  The proceeds from these bank accounts were used to make the down payment on the Kallas residence, refinance and pay down the existing mortgage on the Kallas residence, make the monthly mortgage payments, purchase a new vehicle and provide for other expenditures.

### (1)   **Washington Mutual Account XXXXXXX3572**

105.  The signature card for Washington Mutual Bank account number xxxxxx3572 shows that A. Fisco and Lucia Anolis opened this account on September 11, 2001.  The account was closed on October 23, 2003.  Lucia Anolis is approximately 94 years old.

106. I reviewed the bank statements associated with this account and learned that from September 2001 through October 2003 there were 29 deposits made greater than $500.00 for a total deposit amount of $139,636.00.  The majority of these deposits were in whole figures (i.e., $3,500.00, $9,600, $1,400.00, etc.).

107. SSA Blossom contacted Washington Mutual Bank and

61

requested support for these deposits.  To date, we have received 15 deposit slips which reveal that 14 of the 15 deposits were made in cash.  The deposit which was not made in cash was the deposit used to open the account in the amount of $3,000.00. This deposit was in the form of a check and was issued against the Kallases joint Washington Mutual Bank account number xxxxxx4610.

108.  The bank statements also revealed that only one withdrawal was made from this account in the amount of $144,411.65.  The $144,411.65 withdrawal was in the form of an official check dated October 23, 2003, and was made payable to Orange Coast Title, (escrow company used to purchase the Kallas residence).  The remaining $17,148.86 was taken from Washington Mutual Bank account number xxxxxx7172 discussed below, for a total amount of $161,560.31.  The account was closed after the $144,411.65 withdrawal.

109.  On various dates, I reviewed records obtained from Countrywide Mortgage and learned that on or about October 21, 2003, the Kallases applied and were approved for a home loan in the amount of $633,500 to purchase the Kallas residence (loan number xxxx0275).  The records also reveal that the Kallases made a cash down payment using an official check from Washington Mutual Bank comprised from account numbers xxxxxx7172 and xxxxxx3572, dated October 23, 2003, in the amount of $161,560.31,

62

the same check as mentioned above.

### (2)   Washington Mutual Account Number xxxxxx4672

110. The signature card for Washington Mutual Bank account number xxxxx4672 shows that Irene Fisco opened this Washington Mutual account on December 26, 2003.  Irene Fisco is believed to be M. Kallas aunt.  On or about April 20, 2004, the address on this account was changed from 1771 N. Vermont Avenue, Apt No. 108, Los Angeles, California, to the Kallas residence.  The account was closed on or about February 17, 2006.

111. I reviewed the bank statements associated with this account and learned the following information:

   a.    From December 2003 through February 2006 there were 30 deposits made greater than $500.00 for a total deposit of $227,500.  The majority of these deposits were whole figures (i.e., $3,500.00, $9,600, $1,400.00, etc.).

   b.    To date, we have received support for 23 of the 30 deposits.  Review of the support documents disclosed that 22 of these deposits were cash deposits.

   c.    The bank statements revealed that the account was used to pay the Countrywide Mortgage payment (loan number xxxx0275) for the Kallas residence.  The Countrywide mortgage payments commenced on June 23, 2004, and ended on November 23, 2004, when the Kallases refinanced the Kallas residence with a GMAC mortgage.  During this time frame, six payments were made

from this account to Countrywide Mortgage totaling $24,653.22 ($4,108.87 x 6 payments).

     d.   Additionally, on December 16, 2004, $98,048.66 was withdrawn from this account in the form of an official check made payable to First American Title, the escrow company used to refinance the Kallas residence.

112. On various dates, I reviewed records obtained from GMAC Mortgage and learned the following information:

     a.   On or about December 18, 2004, the Kallases applied for and were approved for a new GMAC home loan in the amount of $533,000.00 for the Kallas residence (loan number xxxxx3487).

     b.   These records revealed that their original mortgage with Countywide Mortgage in the amount of $629,666.19 was paid off.

     c.   The records also disclosed that a cash down payment was made in the amount of $98,048.66.  Irene Fisco was not listed on the GMAC Mortgage application.

     d.   The bank statements revealed that the Kallases also used this account from February 2005 through September 2005, to make their GMAC Mortgage payment.  There were 8 debit withdrawals each for $3,325.23 sent to GMAC Mortgage totaling $26,601.76.

     e.   The bank statements showed that the Kallases

signed withdrawal slips for this account on September 1, 2005 and December 3, 2005, respectively.  Each withdrawal slip indicated that they had power of attorney over the account.  M. Kallas withdraw $45,837.34 in cash and C. Kallas withdraw $6,600.96 in cash.

　　　　f.　The bank statements and supporting documents also revealed that a check, dated June 14, 2005, in the amount of $22,562.73 was made payable to Ford Credit and was written against this account, and signed by Irene Fisco.  On various dates, I conducted surveillance on the Kallas residence and observed a black Ford pickup truck with California license plate number 7T74333 in the driveway.  I queried the license plate number through a California Department of Motor Vehicle ("DMV") database, and learned that the license plate is associated with a 2004 Ford pickup truck registered to "Maria Kallas" at the Kallas residence.  The DMV record also disclosed that there were no liens against the vehicle.

　　113. In April 2007, I received an Internal Revenue Service ("IRS") Form 8300 (Report of Cash Payments over $10,000.00 Received in a Trade or Business) from the Financial Crimes Enforcement Network.  Sunrise Ford dealership located in Fontana, California filed the form in February 2005.  The form revealed that M. Kallas made a $17,000.00 cash down payment on a 2004 Ford pickup truck.

　　114. Shortly after receiving the IRS Form 8300, SSA Blossom

and I went to Sunrise Ford and retrieved the sales packet associated with this vehicle.  Review of the packet revealed that on February 21, 2005, M. Kallas made a $17,000.00 cash down payment towards the purchase of a new 2004 Ford pickup truck. The vehicle sold for $40,575.00 and the remaining $24,304.80 was financed.  However, as stated above, DMV records indicate that there were no liens against this vehicle.

### (3)   Washington Mutual Account Number xxxxxx7486

115. The signature card on Washington Mutual Bank account number xxxxxx7486 reveled that Lucia Anolis opened this account on June 16, 2003.  On or about April 15, 2004, the address on this account was changed from 1771 N. Vermont Avenue, Apt number 108, Los Angeles, California to the Kallas residence.

116. I reviewed the bank statements associated with this account and learned the following information:

a.   From June 2003 through May 2007, there were approximately 24 deposits made greater than $500 each totaling $207,794.  SSA Blossom told me that he contacted Washington Mutual Bank and requested support for these deposits.  SSA Blossom received support for the 24 deposits and I learned that these deposits consisted of: 13 cash deposits, 8 check deposits, and 2 wire transfer deposits (one deposit slip consisted of 3 items - 2 checks and cash).  Most of the figures representing the deposits were in whole numbers (i.e., $3,500.00, $9,600, $1,400.00, etc.).

b.   I traced the four checks and one cash deposit made into this account using the names of the account holders to the same names in the A-Files linked to Botno Inc., and MVCI.  These A-Files contained false information that were submitted to USCIS by M. Kallas and A. Fisco.

c.   Further review of the bank statements for this account disclosed that from October 5, 2005 through May 2, 2007, there were 20 debit withdrawals each for $3,325.23 sent to GMAC Mortgage totaling $66,504.60.

### (4)   Washington Mutual Account Number xxxxxx7172

117. The signature card for Washington Mutual account number xxxxxx7172 shows that A. Fisco opened this account on March 3, 2003.  The account was closed in February 2004.

118. I reviewed the bank statements associated with this account and learned the following information:

a.   From March 2003 through February 2004 there were approximately 9 deposits made greater than $500 each for a total deposit amount of $43,900.00.  The majority of these deposits were whole figures (i.e., $3,500.00, $9,600, $1,400.00, etc.).

b.   To date, we have received support for seven of the nine deposits, which revealed that all seven deposits were made in cash.  As stated above, I reviewed the rental application associated with the apartment where A. Fisco resides, and learned she was retired and had a fixed monthly income of $500.00 and that the Kallases claimed A. Fisco as a dependent on their 2002,

2003, and 2004 federal income tax return.

      c.   The account was used to make two payments towards the Kallas residence Countrywide Mortgage home loan on December 24, 2003 and January 7, 2004, totaling $8,217.74 ($4,108.87 x 2 payments).

      d.   The account was also used to make credit card payments totaling $8,313.70.

      e.   The bank statements further showed that on December 6, 2003, C. Kallas withdraw $9,900.00 in cash from this account by signing a withdrawal slip.  The withdrawal slip revealed that C. Kallas provided his government credentials as identification to withdraw the money.

      f.   On October 23, 2003, A. Fisco withdrew $17,148.86 in cash from the account.  The $17,148.86 withdrawn from this account and the $144,411.65 withdrawn from account xxxxxx3572 are the amounts that make up the official check made payable to Orange Coast Title in the amount of $161,560.31 ($17,148.86 + $144,411.65).  The Kallases used this official check as their down payment when purchasing the Kallas residence.

    **(5)  Washington Mutual Account Number xxxxxx6024**

   119. The signature card for Washington Mutual Bank account number xxxxxx6024 revealed that A. Fisco and Maria Kallas opened this account on March 9, 2000, using an address of 832 Magnolia Avenue, Apt. 14, Pasadena, California.  As of May 2007, the account had an ending balance of $35.73.

120. I reviewed the bank statements associated with this account and learned the following information:

a.   From June 2000 January 2007 there were approximately 46 deposits made greater than $500 for a total deposit amount of $92,780.00.  The majority of these deposits were whole figures (i.e., $3,500.00, $9,600, $1,400.00, etc.).

b.   To date, we have received support for 42 of the 46 deposits, which revealed 37 of the 42 deposits were cash.

c.   A review of cancelled checks, disclosed that the account was used to pay an estimated $26,981.88 in credit card bills (i.e., Macy's, Target, Sears, Nordstrom, etc.).  The account was also used to pay the monthly rent for A. Fisco's residence, totaling an estimated $11,095.00.

### (6)   Washington Mutual Account Numbers xxxxxx7850 and xxxxxx8495

121. I reviewed bank statements associated with Washington Mutual account numbers xxxxxx7850 and xxxxxx8495 and learned the following information:

a.   These accounts were added, (i.e. money market, saving accounts), to account number xxxxxx6024 after that account was opened in October 2000.  A. Fisco and M. Kallas opened account number xxxxxx6024 on March 9, 2000.  Account numbers xxxxxx8495 and xxxxxx7850 were closed in September 2001 and July 2007, respectively.

b.   From October 2000 through May 2007, approximately

69

28 deposits were made greater than $500 for a total deposit amount of $56,990 in these two accounts (xxxxxx7850 and xxxxxx8495). The majority of these deposits were whole figures (i.e., $3,500.00, $9,600, $1,400.00, etc.).

      c.   The statements disclosed that no checks were written against these accounts. The statements also disclosed that the majority of the funds in these accounts were simply withdrawn in cash amounts ranging between $500 and $4,800.

### (7) Washington Mutual Account Number xxxxxx4610

122. The signature card for Washington Mutual Bank account number xxxxxx4610 revealed that the Kallases opened this account on October 13, 1998. As of May 2007, the account had an ending balance of $17,038.35.

123. I reviewed bank statements associated with this account and learned the following information:

      a.   From April 2000 through May 2007, the majority of deposits into this account were from C. Kallas' government salary. Other than C. Kallas' government salary deposits, there were approximately 16 additional deposits greater than $500.00 for a total deposit amount of $16,150. The majority of these deposits were whole figures (i.e., $2,130, $2,000, $1,240, $800, etc.).

      b.   To date, we have received support for 6 of the 16 deposits, which disclosed that the deposits were made in cash.

      c.   Support received from Washington Mutual Bank also

disclosed two additional deposits, one made on December 27, 2006 and the other on January 2, 2007, totaling $10,000 ($4,000 and $6,000, respectively). These two deposits were from checks written against Washington Mutual Bank account number xxxxxx6024, the A. Fisco and Maria Kallas account.

e.   Using the name of the account holder Rodrigo Moreno Bala (Mr. Bala), I also discovered that three checks, totaling an estimated $10,500, were deposited into this account from Mr. Bala's account. Mr. Bala's A-file, Axxxx6475, contained an ETA 9089 and I-140 petition, sponsored by Botno Inc., that was submitted to USCIS by M. Kallas.

f.   The bank statements further disclosed that the Kallases used this account to transfer $34,500 to a TD Ameritrade investment account from July 24, 2004 through May 3, 2007.

g.   I reviewed on various dates records obtained from TD Ameritrade and learned that from July 2004 through May 2007, the Kallases transferred $34,500.00 from account number xxxxxx4610 to C. Kallas' TD Ameritrade account. In addition, the TD Ameritrade records disclosed that the account had a value of $33,516 as of June 30, 2007.


(8)   **Washington Mutual Account Number xxxxxx3383**

124. The signature card for Washington Mutual Bank account number xxxxxx3383 revealed that the Kallases opened this account on April 20, 2006. I reviewed the bank statements associated

71

with this account and learned the following information:

a.    From May 2006 through May 2007 there were three deposits greater than $500 each totaling an estimated $52,259. Two deposits in the amount of $6,129.43 each ($6,129.43 x 2 = $12,258.86) were payroll deposits associated with C. Kallas' government employment.  The other deposit in the amount of $40,000.00 was transferred into this account from the Kallases other Washington Mutual Bank account, account number xxxxxx4610.

b.    The bank statements also revealed that, on three separate occasions, the Kallases transferred funds totaling $23,900 ($9,900, $9,000 and $5,000) from this account to their other Washington Mutual Bank account, account number xxxxxx4610.

c.    The bank statements revealed that the Kallases made five mortgage payments from this account to Countrywide Mortgage from December 1, 2003, through May 16, 2004, totaling $20,544.35.

### (9)   Bank of America Account Number XXXXXX1430

125. The signature card for Bank of America account number xxxxxx1430 shows that A. Fisco opened this account on September 28, 2006, using the Fisco residence as the mailing address. The signature card also lists M. Kallas as a beneficiary on this account.  I reviewed the bank statements associated with this account and learned the following information:

a.    From September 2006 to January 2008, there were approximately 16 deposits in amounts greater than $500 each

totaling approximately $47,870.00.  All the deposits appeared to be cash because the figures were whole numbers (i.e., $8,000, $7,000, $5,000, $3,000, $2,300, $1,000 etc.).

b.    The bank statements also revealed that, check number 1010, dated March 12, 2007 written against the account in the amount of $15,000.00 was made payable to Ms. Curtopelle.  The words "Paid In Full" are written on the top of the check.  The check is signed by A. Fisco.

## VII.   CONCLUSION

126. Based on the foregoing, I believe there is probable cause to believe that CONSTANTINE PETER KALLAS, and MARIA GABRIELA, violated Title 18 United States Code Section 201(b)(2) (bribery), and 2 (aiding and abetting).

Lawrence Owen
Senior Special Agent
U.S. Immigration & Customs Enforcement


Sworn to and subscribed to before me on
June 27, 2008

HONORABLE MARC L. GOLDMAN
UNITED STATES MAGISTRATE JUDGE

73